# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2016 Term

**FILED**

**June 3, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 14-0365

**LAWYER DISCIPLINARY BOARD,**
Petitioner

**V.**

**HOWARD J. BLYLER,**
**A MEMBER OF THE WEST VIRGINIA STATE BAR,**
Respondent

---

**Lawyer Disciplinary Proceeding**
**No. 12-05-614**

**LAW LICENSE SUSPENDED AND OTHER SANCTIONS**

---

**Submitted: May 17, 2016**
**Filed: June 3, 2016**

Jessica H. Donahue Rhodes
Lawyer Disciplinary Counsel
Office of Disciplinary Counsel
Charleston, West Virginia
Attorney for the Petitioner

Gregory A. Tucker
Gregory A. Tucker, PLLC
Summersville, West Virginia
Attorney for the Respondent

JUSTICE DAVIS delivered the Opinion of the Court.

CHIEF JUSTICE KETCHUM dissents and reserves the right to file a dissenting opinion.

**SYLLABUS BY THE COURT**

1.      "A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment.  On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record."  Syllabus point 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

2.      "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law."  Syllabus point 3, *Committee on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

3.      "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the

ethical standards of the legal profession." Syllabus point 3, *Committee on Legal Ethics v. Walker,* 178 W. Va. 150, 358 S.E.2d 234 (1987).

4.      "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'" Syllabus point 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

5.      "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syllabus point 4, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

6.      "Mitigating factors which may be considered in determining the

ii

appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or rectify consequences of misconduct; (5) full and free disclosure to the disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10 ) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses." Syllabus point 3, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

**Davis, Justice**

The issue before us arises out of Howard J. Blyler's ("Mr. Blyler") acts and failures to act in his capacity as a court-appointed special commissioner with respect to judicial sales of property. Proceeds from the judicial sales were being held by Mr. Blyler in a segregated bank account established for the purpose of maintaining the proceeds pending accounting and distribution of the funds to heirs of an estate. However, the proceeds were seized from the account in order to satisfy Mr. Blyler's personal income tax liabilities.

The West Virginia State Bar Lawyer Disciplinary Board instituted disciplinary charges against the respondent, Mr. Blyler, on April 18, 2014, with the filing of a Statement of Charges. Mr. Blyler was served with the Statement of Charges on April 22, 2014, and filed a timely response.

The Hearing Panel Subcommittee ("HPS") of the Lawyer Disciplinary Board found violations of the West Virginia Rules of Professional Conduct ("Rules")[1] and have recommended a strong reprimand and a probationary period of supervised practice for a period of at least eighteen months, in addition to other recommended sanctions. Mr. Blyler

---

[1]The West Virginia Rules of Professional Conduct were amended by this Court by order dated September 29, 2014, with a January 1, 2015, effective date for the amended Rules to take effect. Because Mr. Blyler's conduct occurred prior to January 1, 2015, the former version of the Rules govern this case. We note that the substance of the new Rules would not have resulted in a different disposition.

1

accepts the recommended sanctions.

The Office of Disciplinary Counsel ("ODC") opposes the recommended sanction of reprimand and supervised practice as inadequate. Instead, in addition to other sanctions recommended by the HPS, the ODC requests that this Court impose the sanction of the suspension of Mr. Blyler's law license for at least one year together with a period of supervised practice for twelve months upon successful petition for reinstatement.

We have undertaken a thorough review of the record submitted, the briefs and argument of the ODC and Mr. Blyler, as well as the applicable legal precedent. This Court has carefully considered the thoughtful reasoning of the HPS. We have taken into account the view of the complainant-victim that supervised practice is acceptable and is the roadmap for achieving restitution. Moreover, we are cognizant of the unique factors surrounding the conduct at issue and the contributing tragic personal family circumstances. Our review compels this Court to impose a sixty-day suspension from the practice of law, a supervised practice period of eighteen months, the completion of additional continuing legal education in the subject of ethics, an evaluation by a licensed professional counselor, restitution together with an accounting, and to adopt the remaining sanctions recommended by the HPS.

# I.

## FACTUAL AND PROCEDURAL HISTORY

As we proceed to set out the factual and procedural history of this matter, we observe that the ODC and Mr. Blyler commendably worked cooperatively to enter into extensive stipulations of fact concerning the circumstances surrounding this disciplinary matter. Those stipulated facts were adopted nearly verbatim by the HPS. At the hearing, additional facts were elicited and findings made by the HPS. The ODC advised that it has found no error in the findings of fact made by the ODC. The factual history we provide is drawn from the stipulations, the facts set forth by the HPS, and pertinent testimony elicited at the two hearings held in the course of the disciplinary proceedings.

Mr. Blyler is a lawyer practicing in Cowen, which is located in Webster County, West Virginia. He was admitted to the West Virginia State Bar by diploma privilege on May 18, 1976. As such, Mr. Blyler is subject to the disciplinary jurisdiction of the Supreme Court of Appeals of West Virginia and its properly constituted Lawyer Disciplinary Board.

The circumstances at issue here have their genesis in May 2005, when the executrix of an estate filed an action in the Circuit Court of Braxton County, West Virginia, to sell multiple parcels of real estate owned by the deceased. The lawsuit was filed on behalf

of the executrix by William C. Martin, Esquire ("Mr. Martin"). Mr. Blyler was retained to represent Lloyd Allen Cogar, III ("Mr. Cogar"), who was the son of the deceased and an heir.

On November 10, 2005, the circuit court appointed Mr. Martin and Mr. Blyler as Special Commissioners of the circuit court for the purpose of conducting the sale of the real estate. Mr. Martin and Mr. Blyler were ordered to post bond in the amount of fifty thousand dollars ($50,000.00). Additionally, Bernard R. Mauser, Esquire ("Mr. Mauser") was appointed as Commissioner for the purpose of identifying assets and liabilities of the estate in order to determine their priority and to report to the circuit court.

By order entered on April 27, 2006, upon the report of Special Commissioners, Mr. Martin and Mr. Blyler, the circuit court approved the sale of one parcel of real estate. It was noted that the estate remained pending and that there was a dispute as to the estate assets and liabilities. Accordingly, the court directed that the proceeds of the sale be deposited by Mr. Martin in his trust account to be distributed upon further order of the court.

Immediately upon the sale of a parcel of real estate, Mr. Martin and Mr. Blyler went to Mr. Martin's bank, City National Bank ("the Bank"), and opened an account in which to deposit the proceeds of the sale. The records reflect that the account was styled "William C. Martin Howard J. Blyler, Special Commissioners" ("Special Commissioners'

4

account"). The address listed for the "Special Commissioners' account" was that of Mr. Martin. Initially, Mr. Martin received the account statements. Mr. Martin also retained the checkbook for the account. At the time of opening the "Special Commissioners' account," Mr. Martin used his federal employment identification number. Mr. Blyler did not have his federal employment number and instead gave the Bank his social security number. At the time, Mr. Blyler thought nothing of using his social security number since Mr. Martin also was on the account.

On April 25, 2007, the circuit court entered another order approving an additional sale of real estate and allowing the payment of certain costs. The circuit court also relieved Mr. Martin from his duties as a Special Commissioner due to the fact that he had become a full-time prosecuting attorney. Mr. Martin's bond also was released. The court again noted that the estate was still pending and that the assets and liabilities remained in dispute. The circuit court directed that the balance from the sale was to be deposited by Mr. Blyler into his trust account to be distributed upon further order of the court. The proceeds were deposited in the previously established "Special Commissioners' account" at the Bank.

After Mr. Martin was relieved as Special Commissioner, Mr. Blyler took no action with respect to the "Special Commissioners' account." One day, "Special Commissioners' account" statements began arriving at Mr. Blyler's office. Mr. Blyler

5

presumes that Mr. Martin arranged for the Bank to remove Mr. Martin from the account. The Bank records reflect that, as of the statement period beginning April 9, 2007, the name on the "Special Commissioners' account" was changed to Howard J. Blyler "Special Account." The address had changed to that of Mr. Blyler's office. The account records do not reflect a reason for the account changes, which Mr. Blyler did not request.[2]

After the second sale of real estate, Mr. Blyler contacted Mr. Mauser on numerous occasions seeking to have a fiduciary commissioner's hearing set to determine the assets and liabilities of the estate so as to distribute the funds. Mr. Blyler offered to prepare the hearing notices, if Mr. Mauser would select a date. No hearing was ever scheduled.

The "Special Account" maintained at the Bank reached the amount of ninety-six thousand, eight hundred fifty-one dollars and eighty cents ($96,851.80) by March 2009. On March 16, 2009, a Notice of Levy from the State of West Virginia Tax Department ("Tax Department") was served on the Bank for personal income taxes due and owing by Mr. Blyler. In response to the levy, on March 19, 2009, the Bank withdrew all the sums from the "Special Account." The Bank kept one hundred twenty-five dollars ($125.00) as a processing fee and paid the Tax Department ninety-six thousand, seven hundred twenty-six

---

[2]The account number for the "Special Account" remained the same as the number for the "Special Commissioners' account."

6

dollars and eighty cents ($96,726.80).

The funds taken from the "Special Account" pursuant to the levy were taken without Mr. Blyler's knowledge, authorization, or consent. Mr. Blyler had no involvement in the process and was unaware that the levy would occur. He had no complicity or involvement in the decision-making process that resulted in the levy upon the "Special Account." There is no evidence that indicates any intentional act taken by Mr. Blyler to benefit him financially in the matter. The execution of the levy and the withdrawal of funds from the "Special Account" were separate administrative actions taken by the Tax Department and by the Bank.

Mr. Blyler owed back taxes to the Tax Department in the approximate principal amount of twenty-five thousand dollars ($25,000.00). By March 2009, the total tax liability exceeded one hundred fifty-seven thousand dollars ($157,00.00) including accrued interest and penalties. Mr. Blyler was aware of his personal tax liability, but there is no evidence that he did anything intentionally to use client funds to satisfy his personal liability. He had no reason to anticipate that a tax levy would extend to a special commissioner's account created to hold funds for a third party. Mr. Blyler did not have any advance notice that the funds in the "Special Account" were being seized. He learned of the levy and seizure of the funds via a mailed notice that he received two to three days after the seizure of funds was

7

accomplished.

Upon learning that the funds had been seized, Mr. Blyler immediately notified the Tax Department and the Bank that the funds levied upon were not his personal funds, but, rather, were client funds not subject to levy. Contact was also made with a representative of the Governor's office to see if they might intervene to help recover the funds.

However, at that time, Mr. Blyler took no other steps to recover the money. Significantly, Mr. Blyler failed to notify his client of the adverse action that had been taken. Furthermore, Mr. Blyler did not notify the circuit court about the levy upon the funds in the "Special Account."

Ultimately, on September 11, 2012, the circuit court entered an order indicating that Mr. Blyler was to hold funds in his trust account and that the Tax Department had taken the money from the "Special Account" for a tax levy. It was noted in the order that Mr. Blyler was attempting to retrieve the money. It also was observed that the circuit court had no authority to order a return of the funds because the Bank and the Tax Department were not parties to the pending action. The circuit court ordered Mr. Blyler to take action, including any appropriate legal action, within thirty days.

8

Mr. Cogar filed a complaint against Mr. Blyler on November 21, 2012.  Mr. Cogar alleged that Mr. Blyler failed to alert the heirs of the estate about the money in the "Special Account" being taken by the Tax Department.  It also was alleged that Mr. Blyler had taken no action to recover the money.  Mr. Cogar indicated that he discovered the money was missing on or about September 5, 2012, when a hearing on the matter was held in the circuit court.

By letter dated November 30, 2012, disciplinary counsel forwarded the complaint to Mr. Blyler asking for a response.  Mr. Blyler did not respond.  By letter dated January 14, 2013, sent via certified and regular mail, disciplinary counsel wrote to Mr. Blyler asking for a response by January 24, 2013.  The return receipt was signed by Mr. Blyler and received by the Office of Disciplinary Counsel on January 18, 2013.  On January 24, Mr. Blyler requested an extension to file a response.  An extension was granted to February 6, 2013.  On February 19, 2013, the Office of Disciplinary Counsel received Mr. Blyler's response.

In his sworn response, Mr. Blyler indicated that he had been hired by Mr. Cogar to represent him in a partition action that had been filed by Mr. Cogar's step-mother to sell property that was owned by Mr. Cogar's father so that various debts could be paid and the proceeds divided.  Mr. Blyler noted that sales were accomplished and all funds were

9

deposited in the "Special Commissioners' account" that listed both Mr. Martin and Mr. Blyler. All parties had been waiting on a report from the fiduciary commissioner, Mr. Mauser, as to the priority of liens and how the heirs were to receive their distributive shares. Mr. Blyler stated that he had contacted Mr. Mauser numerous times requesting that the matter proceed so that the funds could be distributed. It also was represented that Mr. Blyler was contacted several times by a female who indicated that she was the sister of Mr. Cogar. The woman was inquiring about the status of the case. Since he did not represent her, Mr. Blyler advised her to contact Mr. Mauser as it was his report that needed to be completed. Mr. Blyler stated that he did not advise her or anybody else that he did not know where the money was.

With respect to the establishment of the account, Mr. Blyler remarked that the account was set up as a "Special Commissioners' account" by he and Mr. Martin so that it would be separate and no other monies commingled with it. This was also done so that, upon conclusion of the matter, all checks and deposit tickets could be lodged with the court.

Mr. Blyler stated that, as soon as he learned about the tax levy and that the Bank had turned over the funds to the Tax Department, he immediately contacted both to explain that the money was not his and, in fact, belonged to an estate. Subsequent to the hearing in September 2012, Mr. Blyler prepared a draft of a complaint suing the Bank and

the Tax Department and seeking return of the funds. Thereafter, Mr. Cogar retained the services of another attorney. The draft complaint was provided to the new attorney for purposes of revision and to include his additional clients. The draft also was provided to an additional attorney who had been appointed Special Commissioner and who represented another heir. Mr. Blyler stated that once he received the draft with revisions from the other attorneys, he would finalize it for filing. The draft complaint was included with the sworn response of Mr. Blyler.

The civil complaint against the Bank and the Tax Department seeking the return of the levied funds on behalf of Mr. Blyler, Mr. Cogar, and other heirs was filed on October 15, 2013, in Braxton County, West Virginia. The civil action was later transferred to the Circuit Court of Kanawha County due to venue requirements with respect to the Tax Department.

On November 19, 2013, Mr. Blyler appeared before the Investigative Panel of the Lawyer Disciplinary Board and gave a sworn statement. He conceded that Mr. Cogar had a valid complaint. According to Mr. Blyler, he did not inform his client about the March 2009 levy and the seizure of the funds. Further, Mr. Blyler stated that he believed Mr. Cogar learned of the seizure of the funds in September, 2012. Mr. Blyler admitted that he should have taken more action to try to recover the funds in a timely fashion. He agreed that Mr.

Cogar was correct and that suit should have been filed sooner. Upon inquiry from disciplinary counsel, Mr. Blyler opined that Mr. Cogar and the heirs did not have a statute of limitations problem in regard to the filing of the complaint because it was their money and they did not know it had been seized. He further indicated that he did not think that the Tax Department would raise statute of limitations as to the heirs because it was so abundantly clear that the money belonged to them.[3]

Mr. Blyler stated that he did not have the personal resources to replace the funds. He suggested that Mr. Cogar's current counsel raise the issue of the Special Commissioner's bond of fifty thousand dollars ($50,000.00) that was in place. Additionally, Mr. Blyler requested that Mr. Cogar send him a letter that could be turned over to Mr. Blyler's malpractice carrier. Mr. Cogar sent that letter and the carrier was placed on notice by Mr. Blyler.

In the sworn statement, Mr. Blyler also provided further information about his communications with the Bank and with staff at the Tax Department. As to the Bank, Mr.

---

[3]On November 2015, this Court issued a Memorandum Decision regarding the civil action filed by Mr. Blyler together with Mr. Cogar and other heirs of the estate against the Tax Department and the Bank. This Court affirmed the circuit court's determination that the claims were barred due to the expiration of the two year statute of limitations. *Blyler v. Matkovich*, No. 14-0760, 2015 WL 7628843 (W. Va. Nov. 23, 2015) (memorandum decision).

Blyler stated that the position the Bank took was simply that it had done absolutely nothing wrong and that there was nothing the Bank could do to assist in recovery of the funds. With respect to the Tax Department, Mr. Blyler stated that staff indicated that supplying circuit court orders regarding the funds and the accounts would be adequate to assess if the seized funds were the property of the heirs such that the funds would be returned. Mr. Blyler had provided the orders to the Bank, and Tax Department staff indicated that they would obtain copies from the Bank.

It was further represented by Mr. Blyler that, in connection with the September 2012 hearing before the circuit court, Mr. Blyler again spoke with staff at the Tax Department. Mr. Blyler was told to provide Tax Department staff with all the circuit court orders pertaining to the account and the staff would sit down and do a "financial statement" of the matter. Mr. Blyler sent Tax Department staff the orders and sent a financial statement for the account. In a follow-up phone call, Mr. Blyler learned that the Tax Department was taking the position that Mr. Blyler was responsible and the money would not be returned.

On November 24, 2013, the circuit court entered an order forfeiting the Special Commissioner Bond issued to Mr. Blyler. It was further ordered that the Fifty thousand dollars ($50,00.00) in proceeds from the bond be paid into the Braxton County Circuit Clerk's Office. The clerk's office was ordered to deposit the money into an interest bearing

13

account pending the resolution of the issues and controversies related to the estate.

Mr. Cogar and his siblings have filed a professional negligence claim against Mr. Blyler. They are seeking damages for the losses suffered due to the seizure of their funds. Mr. Blyler's malpractice insurance carrier apparently is contesting coverage on two grounds. First, the carrier contends that the Tax Department was wrong in seizing the funds. Second, the carrier asserts that, with respect to the complained of action, Mr. Blyler was acting as a special commissioner and not as a lawyer such that there is no coverage.

Mr. Blyler's law practice is a small, rural and general practice. In large part, the practice consisted of criminal defense appointments, abuse and neglect cases, domestic relations, and guardian ad litem work.

During the course of the above-described events, Mr. Blyler found himself in the midst of a personal family hardship. His wife of forty-five (45) years, Madonna Blyler, who was a school teacher, began suffering from serious cognitive problems which forced her to take an early retirement in 2008. Prior to her retirement, Mr. Blyler helped compensate for his wife's failing mental capacity by assisting her with her teaching responsibilities. He graded all her student papers, prepared student report cards and performed various tasks that she was unable to accomplish. Her fellow teachers and school administrators also were

assisting. As the problems progressed, she became unable to work. In March 2009, at the age of fifty-four, she applied for and received social security disability due to her diagnosis of early onset Alzheimer's disease.

Mr. Blyler was a caring and devoted husband who provided his wife virtually around-the-clock care from the time of her diagnosis in March 2009 until her death in December 2014. At times, Mr. Blyler had outside help to care for his wife while he was at work, but that eventually proved difficult and unworkable. He did not have the financial means to provide her with the full-time, in-home care that she required. Mr. Blyler was committed to keeping his wife at home and out of an institutional nursing home placement.

Mr. Blyler had relationships within the legal community that afforded him the ability to care for his wife's needs while simultaneously meeting the obligations of his profession. For example, he was able to be accompanied by his wife at scheduled depositions, he took his wife to hearings and did record room work after hours so she could sit with him. At times, his wife sat with staff in the clerk's offices. Over time, her needs steadily increased, as did her dependence on Mr. Blyler as she experienced continuing cognitive decline and developed other serious medical conditions. For a lengthy period of time, her condition required travel three times per week from Cowen to Parkersburg to a health care provider. Ultimately, she required a wheelchair and became incontinent. Mr.

Blyler was caring for her every need.

Mr. Blyler made every effort to care for his wife and continue to work and serve the community. Eventually, during the last year of his wife's debilitating illness, in order to meet her needs, he began restricting the amount of work he accepted. By the Fall of 2012, he ceased accepting appointments for abuse and neglect and felony cases. His number-one priority became his wife.

Joyce Helmick Morton, a lawyer who has practiced in Webster County some thirty-six years, testified regarding Mr. Blyler's practice and the illness of his wife. Ms. Morton testified that the early onset Alzheimer's "took a toll" on Mr. Blyler. She testified as to the care Mr. Blyler provided for his wife, including the need to take her to the bathroom. She stated that "everything took a backseat to his wife for a long time." As to Mr. Blyler's professional competence, Ms. Morton testified that Mr. Blyler always appeared to be competent and diligent. In response to questioning from disciplinary counsel, Ms. Morton spoke about the nature of the Webster County community, the need for legal services and the role of Mr. Blyler:

> I did, and I actually thought that's why I was coming here, to talk about the need that we have in Webster for lawyers. While I was on the Board of Governors for a period, one of my focuses was trying to attract people into the rural practice of law. Right now, there are two lawyers in Webster Springs

16

beside the prosecutor and the assistant prosecutor, and that's [Mr. Blyler] and I.

I had actually stopped practicing law for a while, but am back into the throws of it, just because there's nobody to service the community there.

And you get these calls. And there are things that [Mr. Blyler] does that I just won't do. . . Like the domestic,. . . And you don't get rich practicing law in Webster County, but you do perform a service. And people need Howard Blyler. I can't fill his need. I can't do what he does.

And honestly, if [Mr. Blyler] loses his license, there's nobody there. There's me who's doing it part time. And don't get me wrong, I don't condone what he did, but I also know the good that he's done and the service he's performed and told [disciplinary counsel] that surely, there's something short of a suspension that could be done, so that he can continue what he's done for 41 years. . . .

Ms. Morton expressed her belief that, if Mr. Blyler were permitted to continue to practice law, she would "bet the farm" that nothing would happen again. She stated that Mr. Blyler was remorseful and had learned his lesson. She further surmised that it was a combination of factors that led to the seizure of funds. Those factors included his wife's illness; the changes with Mr. Martin; and the failure of the Special Commissioner, Mr. Mauser, to set the matter for hearing, which resulted in tremendous delay. Additionally, Ms. Morton commented that, had Mr. Blyler not been dealing with his wife's Alzheimer's disease, the situation with the account would not have been "shoved to the side." Ms. Morton believes that Mr. Blyler made a very human mistake addressing problems with a loved one

17

that resulted in his practice of law taking a "backseat."

Ms. Morton agreed to be Mr. Blyler's supervising lawyer, in the event he is permitted to continue to practice with supervision for a period of time. Ms. Morton testified that she believed Mr. Blyler would cooperate with her and would work to make restitution. Mr. Blyler indicated that Ms. Morton met with him in order to review his office practices.

Dwayne Vandevender, Esquire, the prosecuting attorney of sixteen years in Webster County also testified. Mr. Vandevender has known Mr. Blyler some twenty-four years. He testified that, in his experience, Mr. Blyler, as either a guardian ad litem or representing an individual in abuse and neglect proceedings, understood the process; provided timely, competent, legal representation; and argued well in court appearances. According to Mr. Vandevender, competent legal services were also provided by Mr. Blyler to the criminal defendants he represented. Mr. Vandevender agreed that the situation with the seizure of the funds and Mr. Blyler's failure to tell the heirs about the seizure was an aberration in Mr. Blyler's legal representation and practice. Mr. Vandevender further remarked that he would have no hesitation if Mr. Blyler were permitted to continue to practice and be appointed to abuse and neglect and felony cases.

Mr. Cogar testified before the HPS that he first learned of the March 2009

18

seizure of the money in the "Special Account" during the course of the circuit court hearing held in September 2012. That hearing came about as a result of his grandmother making repeated calls to the office of the judge regarding the lengthy delay in finalizing the estate. He further testified that Mr. Blyler had opportunities to tell him and/or his grandmother about the seizure of the funds and did not do so. Mr. Cogar's grandmother called Mr. Blyler about the matter, and Mr. Cogar and his grandmother went to Mr. Blyler's office on a few occasions. According to the testimony of Mr. Cogar, Mr. Blyler told them only that the matter was being delayed by the court system. Mr. Cogar also testified about the strain the delay placed on his sisters. The situation has resulted in a loss of confidence in the legal system. Mr. Cogar understood that, in September 2012, the judge placed the responsibility of retrieving the money from the Tax Department on Mr. Blyler. Mr. Cogar testified that he knew that fifty thousand dollars ($50,000.00) from the bond revocation had been recovered and placed into an account. It has not been disbursed.

Before the HPS, Mr. Blyler testified that he was embarrassed by the tax levy, which resulted in his failure to inform his client and the circuit court of the seizure of funds. Mr. Blyler was very contrite and emotional during the HPS hearing. He was repeatedly brought to tears during testimony relating to his admitted violations and during the testimony

relating to the illnesses and deaths of his wife and his mother.[4] Mr. Blyler was apologetic and regretful. The illness of his wife took an emotional and financial toll on Mr. Blyler. He expressed his desire to make restitution if he has the means to do so by continuing to practice law. Initially, after the deaths of his wife and mother, Mr. Blyler did not work for a short period of time. He currently is practicing on a limited basis pending the outcome of this matter. Mr. Blyler has not resumed accepting appointments for abuse and neglect, guardian ad litem, or felony cases due to the protracted nature of such cases and the uncertainty of his status as a practicing lawyer. He has advised the local circuit court judge that he will go back on the panel of lawyers able to take such appointments in the event he is permitted to continue his practice of law.

## A. Violations Found by the Hearing Panel Subcommittee

Mr. Blyler readily admitted and stipulated to his violations of the Rules. As Mr. Blyler stipulated, the HPS found that, due to his failure to act with reasonable diligence by failing to retrieve the money seized by the Tax Department, which resulted in harm to his client, Mr. Blyler violated Rule 1.3 of the Rules regarding diligence, which provides: "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

---

[4]Mr. Blyler's mother passed away during the pendency of the proceedings before the HPS.

20

Due to his failure to keep his client, Mr. Cogar, reasonably informed about the seizure of the funds by the Tax Department, as stipulated by Mr. Blyler, the HPS found that Mr. Blyler violated Rule 1.4(a) and (b) of the Rules, which provide as follows:

> Rule 1.4. Communication. (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Because, as Mr. Blyler also stipulated, he failed to inform Mr. Cogar and others about the money being taken from the "Special Account," the HPS found that Mr. Blyler violated Rule 8.4(c) and (d) of the Rules regarding misconduct which provides: "[i]t is professional misconduct for a lawyer to: . . . (c) [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) [e]ngage in conduct that is prejudicial to the administration of justice." The HPS found that the misconduct of Mr. Blyler did not constitute dishonesty, fraud, or misrepresentation. Rather, the HPS found that there was an "element of deceit" on the part of Mr. Blyler as he neglected to advise Mr. Cogar or his grandmother about the seizure of funds on the occasions when she asked about the estate on behalf of her grandson, or on the occasions when Mr. Blyler met with one or both of them. The HPS noted that the testimony of both Mr. Cogar and Mr. Blyler confirmed that the two never had an actual discussion about the status of the funds. However, as Mr. Cogar testified, there were opportunities for Mr. Blyler to communicate what had happened to the

funds. Mr. Blyler admits that he should have informed them of the seizure. The HPS found that the seizure of the funds did not result from any intentional act or omission on the part of Mr. Blyler. His failure was neglecting to inform his client and failing to take all action necessary to retrieve the money.

The HPS also found that, because Mr. Blyler failed to timely retrieve the money taken by the Tax Department, and also failed to make reasonable efforts to retrieve the money, he violated Rule 3.2, which provides for expediting litigation and states: "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interest of the client."

Despite the urging of the ODC, the HPS did not find a violation of Rule 1.15(a), which provides as follows:

> Rule 1.15. Safekeeping property. (a) A lawyer shall hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account designated as a "client's trust account" in an institution whose accounts are federally insured and maintained in the state where the lawyer's office is situated, or in a separate account elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safe guarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of representation.

The HPS additionally found that Mr. Blyler complied with the statutory

22

provisions of West Virginia Code §55-12-1 (1923) (Repl. Vol. 2008), which requires that special commissioners deposit funds realized from judicial sales of real estate into a special account. The HPS concluded that there was a perfect storm of events surrounding the "Special Account," including the removal of Mr. Martin as a joint fiduciary, the change in the name or title of the account, and the mistaken payment of the funds from the account by the Bank.

The ODC also sought a finding of a violation of Rule 3.4(c) regarding a lawyer's duty of fairness: "[a] lawyer shall not: . . . (c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." Mr. Blyler refused to stipulate to a violation of Rule 3.4(c). The HPS did not discuss Rule 3.4(c) and made no finding of a violation of that rule.

### B. Factors Considered By the HPS

The four factors that must be considered by the HPS in addressing lawyer disciplinary matters are set forth in Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure. The first factor is whether the lawyer violated a duty owed to a client, to the public to the legal system, or to the profession. The second factor is whether the lawyer acted intentionally, knowingly, or negligently. The third factor is the extent of the actual or potential injury. The fourth factor is the existence of any aggravating or mitigating

23

factors.

Regarding the first factor, the HPS found that Mr. Blyler violated his duties to his clients flowing from his failure to contact and inform Mr. Cogar that the funds had been seized, his failure to file a timely lawsuit to retrieve the seized funds, and his failure to diligently pursue actions to retrieve said funds.

As to the second factor, the HPS found that Mr. Blyler's conduct in relation to the establishment of the "Special Account" and the ultimate seizure of the funds constituted the least culpable conduct of negligence. The HPS noted that Mr. Blyler lacked an intent to gain financial benefit; and that there was no advance knowledge of the levy, the seizure of funds, and the payment of the funds by the Bank. The HPS remarked that the case was unique and troublesome due to a variety of facts that had little to do with the acts of Mr. Blyler. Specifically, those facts were found to include the co-fiduciary's[5] relief of responsibilities as a Special Commissioner, the change of name on the account, and the failure of Mr. Mauser[6] to timely report the liabilities of the estate with priorities of those entitled to compensation such that the distribution of the funds may have been authorized by

---

[5]Mr. Martin did not testify and the record reflects that he was deceased at the time of the HPS hearing.

[6]Mr. Mauser did not testify in this matter. The record provides no explanation for his delays in accounting and reporting with respect to the judicial sales and the estate.

the circuit court. The HPS further found that the negligence of Mr. Blyler continued with his failure to timely file suit seeking the return of the funds. Mr. Blyler's lack of diligence resulted in the dismissal, based upon the expiration of the statute of limitations, of the action that ultimately was filed. Additionally, the HPS found that the most egregious conduct was Mr. Blyler's intentional failure to inform Mr. Cogar of the seizure.

As to the third factor, regarding the actual or potential injury, the HPS did not explicitly address the factor. However, the HPS found that ninety six thousand, eight hundred fifty one dollars and eighty cents ($96,851.80) had been removed from the "Special Account." It further found that, after the forfeiture of the fifty thousand dollar ($50,000.00) bond, which replenished about half the funds seized, there still was a deficiency of nearly forty seven thousand dollars ($47,000.00), some of which may be subject to distribution to Mr. Cogar and his family. The HPS found that, while the seizure caused the initial economic harm to Mr. Cogar and his family, Mr. Blyler's acts and failures to act contributed to the subsequent and ultimate financial harm.

As to the fourth factor, regarding the presence or absence of aggravating or mitigating factors, the HPS found the presence of both. With respect to aggravating factors, the HPS found dishonesty in failing to inform Mr. Cogar of the seizure of funds and failing to diligently move forward with actions to rectify the situation. The HPS also determined

25

that Mr. Blyler's substantial experience in practicing law and understanding the appropriate, expected, and required conduct was an aggravating factor.

With respect to mitigating factors, the HPS found a number of such factors present. Mitigating factors found by the HPS include the lack of prior disciplinary action, extraordinary personal problems with the chronic and progressive deterioration of his wife's health, his good character, the absence of selfish motive, and remorse. The HPS remarked as follows:

> In review of other cases in this jurisdiction where mitigation played a role in determining an appropriate recommendation as to sanctions against a practicing lawyer, the HPS could not find any with stronger compelling facts to warrant more lenient consideration of probation and a reprimand as opposed to a suspension. The mitigating factors do not however, excuse his violations. The fact that he did not notify his client of the seizure of the funds, coupled with his failure to act immediately to rectify this situation, cannot be excused and some disciplinary sanction is both appropriate and necessary.

### C. The HPS's Recommendation and the ODC's Objections

To this Court, the HPS recommends that Mr. Blyler (1) be issued a strong reprimand; (2) be placed on probation for a period of at least eighteen months; (3) be permitted to practice law during the period of probation under the supervision of Joyce

26

Morton[7] or another lawyer approved by this Court and the ODC; (4) make restitution of the amounts seized from the special commissioner account within thirty-six (36) months from the date of the Court's order if the same is not fully satisfied in the Cogar's pending negligence action against him; and (5) pay the costs and expenses incurred by the ODC in the prosecution of this proceeding and in overseeing the period of probation and the fulfillment of his obligations in making restitution.

The ODC disagrees with aspects of the HPS analysis as to the factors considered in determining the sanction. It is argued by the ODC that, in addition to the violation of duties owed to his client, Mr. Blyler also violated duties to the public and the legal system. Additionally, the ODC contends that the only negligent conduct was the initial failure to properly name the account from which the funds were seized. According to the ODC, all other conduct of Mr. Blyler was intentional and should be evaluated as such. The ODC further observes that there was a failure by the HPS to make an explicit statement regarding the amount of injury. In addition to the loss of funds, the ODC argues that there is continuing injury as the estate remains open and Mr. Blyler's client had to employ additional counsel in an effort to recover funds and to file a professional negligence action. With regard to aggravating factors, the ODC contends that Mr. Blyler received discipline

[7]Ms. Morton has since been elected to the position of Family Law Judge, which prevents her from serving as Mr. Blyler's supervising attorney.

27

from the Investigative Panel in the form of two prior admonishments and prior discipline from this Court in the form of a reprimand.

The ODC argues that the base appropriate sanction for Mr. Blyler is disbarment due to his deceit in failing to inform Mr. Cogar of the seizure of funds. The ODC contends that there is a significant amount of money at issue that may never be recovered. The contention of the ODC is that Mr. Blyler has had the benefit of payment of his tax obligation, while his client has been left with nothing. The ODC asserts that, when viewing the matter as one supporting disbarment, the mitigating factors, including the illness of Mr. Blyler's wife, his cooperation with the disciplinary process, and his degree of remorse, all compel the conclusion that Mr. Blyler receive a one year suspension and supervised practice for a period of one year.

On the other hand, Mr. Blyler asserts that, given the facts involved, the recommendation of the HPS is reasonable and appropriate. Mr. Blyler points to the significant mitigating factors involved. He contends that this Court should give great weight to the position of Mr. Cogar that Mr. Blyler should be permitted to continue to practice with supervision so that restitution can be made. Mr. Blyler notes the importance of his cooperation, his unequivocal admissions, and his stipulations of both facts and violations with disciplinary counsel. It is the view of Mr. Blyler that he has not personally benefitted

28

from his misconduct in that the debt to the Tax Department was transferred to his client without his knowledge or participation. He owes the money and wants to make restitution.

Mr. Blyler seeks to have this Court take into consideration that he practices law in a severely economically depressed area where, historically, only three lawyers practiced. He advises that, as a result of the recent election, Mr. Blyler is now the only lawyer practicing in the area. Mr. Blyler contends that the suspension of his law license would result in hardship for those in need of legal services in the community. He asserts that allowing him to retain his license under a period of supervision would serve two purposes. First, it would assist the community with respect to the need for legal services. Second, it would provide the only meaningful opportunity for those entitled to the proceeds of the real estate sale to be made whole in that Mr. Blyler would have the ability to pay restitution.

## II.

### STANDARD OF REVIEW

The standard of review in lawyer disciplinary matters is as follows:

A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings

29

are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. pt. 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

Rule 3.7 of the West Virginia Rules of Lawyer Disciplinary Procedure provides: "[i]n order to recommend the imposition of discipline of any lawyer, the allegations of the formal charge must be proved by clear and convincing evidence."

Furthermore, it is well-settled that "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Committee on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984). Guided by these principles, we evaluate this disciplinary action.

### III.

### DISCUSSION

Inasmuch as Mr. Blyler stipulated to his violations of the Rules, we need address only one violation issue: the ODC's contention that Mr. Blyler should have been found to have committed violations of Rule 1.15(a) and Rule 3.4(c). Thus, we first address the ODC's objections to the failure of the HPS to find that Mr. Blyler violated Rule 1.15(a) as to safekeeping property and Rule 3.4(c) regarding knowingly disobeying an obligation of

30

a tribunal.  Following that discussion, we will address the sanctions to be imposed.

The ODC contends that, because the circuit court's orders of April 25, 2006, and April 27, 2007, directed that the money from the real estate sales be placed in trust accounts, which did not occur, Mr. Blyler is in violation of both Rule 1.15(a) and Rule 3.4(c). The ODC asserts that the HPS confused the difference between a trust account and an IOLTA[8] account.  The ODC indicates that it did not advocate that the funds should have been placed in an IOLTA account because the amount at issue was not nominal and was not expected to be held for a short period of time.

Mr. Blyler argues that the HPS correctly found that Rules 1.15(a) and 3.4(c) were not violated because he complied with the letter of the statute controlling where special commissioners appointed by the courts to sell real estate are to deposit funds. West Virginia Code §55-12-1 (1923) (Repl. Vol. 2008) provides that special commissioners must be bonded and deposit all funds in an account as special commissioner in a bank in the county

---

[8]An IOLTA account is an Interest on Lawyer Trust Account.  Pursuant to 1.15(f) of the Rules of Professional Conduct,

> [a] lawyer who receives client funds that are nominal in amount or are expected to be held for a brief period shall establish and maintain a pooled, interest or dividend-bearing account for the deposit of such funds at an eligible financial institution in compliance with State Bar Administrative Rule 10.

where the property or cause is situated. Mr. Blyler deposited the funds in a special commissioner account in Braxton County where the suit was pending and the sale had been ordered.

This Court observes that the two circuit court orders using the term "trust account" were prepared by Mr. Blyler. We further observe that Mr. Blyler testified that, with respect to the many stipulations that he entered into with the ODC, he refused to stipulate to the effect he did not follow a court order by placing the money in his trust account. He refused to so stipulate because the statute did not require him to deposit the funds in a trust account and the circuit court's order did not provide that the funds were to be deposited in his IOLTA account. He additionally stated that, in his experience, funds from judicial sales were always placed in a special commissioner account rather than being placed in an IOLTA account. This process allows that, when a matter concludes, the special commissioner may submit to the circuit court copies or originals of account statements and checks pertaining exclusively to specific funds. Mr. Blyler testified that there have been times when he was a special commissioner as to three or four different judicial sales and had separate accounts established for each one. He further explained that, in his experience doing title searches, all the judicial sales he had seen had used a special commissioner account.

A reading of the transcript makes it plain that there was some confusion in the

32

proceedings below as to trust accounts, IOLTA accounts, and special commissioner accounts. Clearly, Mr. Blyler believed that the establishment of a special commissioner account for the proceeds of the judicial sales constituted a form of trust account in accord with W. Va. Code §55-12-1 and the circuit court orders he drafted, while being distinct from his IOLTA account. Under these facts, we find that Mr. Blyler did not "knowingly" disobey the court orders with respect to the establishment of the "Special Commissioners' account," as required to find a violation of Rule 3.4(c) (directing that a lawyer shall not "*knowingly* disobey an obligation under the rules of a tribunal. . . . " (emphasis added)). Rather, he was conforming his practice to the command of W. Va. Code §55-12-1, and the practice of the local bar. Perhaps the better approach would have been to style the account as a Special Commissioner Trust Account in a manner that clearly distinguished it from personal funds. However, because no personnel from the Bank were called to testify, the record is blank as to whether the style or name of the account would have affected the conduct of the Bank in resisting turning over the funds to the Tax Department or in providing prior notice and opportunity to take action to resist the levy. Inasmuch as the Rule requires that a lawyer shall not "knowingly" disobey an obligation of a court, we do not find that Mr. Blyler violated Rule 3.4(c).

With respect to the requirement of safekeeping property, Mr. Blyler did hold the funds in a segregated account intended to be separate from his own property. He also

properly reported the sales to the circuit court. However, the account was identified with his personal social security number. That mistake was compounded by the failure of Mr. Blyler to take any action to assure the security of the account once his co-fiduciary, Mr. Martin, was relieved of his duties as a special commissioner. Mr. Blyler also failed to notice or inquire about the change in the name of the account to that of "Special Account" once the statements began coming to his office. From these facts, we conclude that the funds were not properly identified as belonging to others and were not appropriately safeguarded. Thus, this Court determines that, while there does not appear to be intentional wrongdoing, there was a failure to safely keep the funds thereby constituting a violation of Rule 1.15(a).

We now turn our attention from the issue of the HPS findings to the question of the appropriate sanctions to be imposed on Mr. Blyler. Rule 3.7 of the Rules of Lawyer Disciplinary Procedure provides that, in order to recommend the imposition of discipline upon a lawyer, "the allegations of the formal charge must be proved by clear and convincing evidence." *Accord Syl. pt. 2, Lawyer Disciplinary Bd. v. Cunningham,* 195 W. Va. 27, 464 S.E.2d 181 (1995). The various sanctions which may be recommended to this Court are set forth in Rule 3.15 of the Rules of Lawyer Disciplinary Procedure, which provides:

> A Hearing Panel Subcommittee may recommend or the Supreme Court of Appeals may impose any one or more of the following sanctions for a violation of the Rules of Professional Conduct . . . (1)probation; (2) restitution; (3) limitation on the nature or extent of future practice; (4) supervised practice; (5) community service; (6) admonishment; (7) reprimand;

(8)suspension; or (9) annulment. When a sanction is imposed the Hearing Panel Subcommittee may recommend and the Court may order the lawyer to reimburse the Lawyer Disciplinary Board for the costs of the proceeding. Willful failure to reimburse the Board may be punished as contempt of the Court.

In devising suitable sanctions for attorney misconduct, this Court has recognized that "[a]ttorney disciplinary proceedings are not designed solely to punish the attorney, but rather to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice." *Lawyer Disciplinary Bd. v. Taylor*, 192 W. Va. 139, 144, 451 S.E.2d 440, 445 (1994). Furthermore, in considering this matter, we are mindful of this Court's holding in Syllabus point 3 of *Committee on Legal Ethics v. Walker,* 178 W. Va. 150, 358 S.E.2d 234 (1987):

> In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

With these principles in mind, we proceed to consider the four factors set forth in Rule 3.16 of the Rules of Lawyer Disciplinary Procedure:

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall

consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors"

Syl. pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

First, we consider whether Mr. Blyler violated a duty owed to a client, to the public, to the legal system, or to the profession. A lawyer owes an ethical duty to clients including the duty of candor, loyalty, diligence, and competence. Lawyers also owe duties to the public who rely on lawyers to protect their interests. The general public deserves lawyers with the highest standards of honesty and integrity. As officers of the court, lawyers owe duties to the legal system whereby they must conduct themselves within the bounds of the law and abide by the rules of substance and procedure which afford the administration of justice. As to the legal profession, lawyers owe an ethical duty to maintain the integrity of the profession.

The record plainly establishes that Mr. Blyler violated duties owed to his client. He breached the duty to his client by failing to preserve property as required by Rule 1.15(a), failing to act diligently, in violation of Rule 1.3, and failing to communicate with candor,

36

which violated Rule 8.4(c). Specifically, Mr. Blyler failed in safekeeping the funds, failed timely to take reasonable appropriate action to recover the funds, and failed to inform his client of the adverse seizure of funds. Indeed, it appears that Mr. Blyler "stuck his head in the sand" from the time of the seizure of the funds in March 2009 until the hearing before the circuit court in September, 2012. Mr. Blyler undertook no meaningful action to recoup the funds until he was mandated to do so by the circuit court. Ultimately, his failure to diligently expedite litigation as to the Tax Department and the Bank resulted in further harm with a decision that the legal action taken in an effort to recover the funds was time barred by the statute of limitations. *Blyler v. Matkovich*, No. 14-0760, 2015 WL 7628843 (W. Va. Nov. 23, 2015) (memorandum decision).

The established facts also compel the conclusion that Mr. Blyler violated his duty to the general public due to his deceitful conduct in failing to disclose the loss of the funds he was entrusted to protect, which violated Rule 8.4(c). Additionally, Mr. Blyler violated his duty to the legal system when he failed promptly to inform the circuit court of the seizure of the funds from the proceeds of the judicial sale. The circuit court had placed Mr. Blyler in a position of trust and safekeeping. Mr. Blyler's acts and failures to act utterly violated that trust.

Second, we consider whether Mr. Blyler acted intentionally, knowingly, or

37

negligently.  The American Bar Association Standards for Imposing Lawyer Sanctions instruct that the most culpable mental state is that of intent, which consists of conduct by the lawyer with a conscious objective or purpose to achieve a particular result.  The next most culpable mental state is that of knowledge when there are acts by the lawyer with awareness of the nature of the acts or the potential consequences of the conduct.  However, with the state of knowledge there is no conscious effort to attain a particular result.  The least culpable mental state is negligence, which involves a failure to be aware of substantial risks at issue.

The record clearly and convincingly establishes that the conduct of Mr. Blyler in establishing and maintaining the account until the time of the levy and seizure of the funds by the Tax Department was negligent with respect to safekeeping.  The record reflects that Mr. Blyler took no action that was designed to achieve any improper result or gain him any financial benefit from the funds.  He took steps to segregate the funds and to meet the statutory requirements as to special commissioner accounts.  He properly reported to the circuit court regarding the property sales and sought the necessary judicial approvals of the sales of property.  He had no prior knowledge that the "Special Account" would be levied. The record does not reflect why Mr. Mauser did not file a timely report with the circuit court so that distribution of the funds would have been accomplished.  It was an extended period of two years that the proceeds from the judicially approved sales sat in the "Special Account" awaiting an accounting, report, and distribution.  Mr. Blyler testified that he made

unsuccessful attempts to prompt movement toward distribution as the delay was so protracted. The testimony was that each time the sister of Mr. Cogar called to inquire about the status of the distribution, Mr. Blyler called Mr. Mauser and requested that a hearing be set.

The conduct of Mr. Blyler subsequent to the seizure is somewhat more challenging in terms of defining the culpable mental state. Certainly, his initial failure to take action directed toward recovery of the funds was negligent. His meager efforts with respect to the Bank and the Tax Department also were negligent. As time wore on and absolutely nothing was done to recover the funds, his mental state necessarily transformed into that of knowledge. Mr. Blyler had knowledge that the funds were seized and surely had an awareness that failing to act would have adverse consequences. However, there is no evidence to suggest that Mr. Blyler was seeking to accomplish a particular result favorable to himself. We find that his post-seizure conduct in failing to take action, including that of instituting litigation for purposes of attempting to recover funds, has elements of both negligence and knowledge.

The most serious conduct at issue is Mr. Blyler's failure to inform his client and the court as to the events resulting in the loss of the funds. This failure of candor with his client and the court egregiously extended over a three-year period. While there are no

facts suggesting that Mr. Blyler ever affirmatively lied or misrepresented the status of the account, the violation is rooted in the omission of significant, relevant, and adverse facts. The record is clear that Mr. Blyler avoided the facts when presented with opportunities to inform his client and other interested heirs about the seizure of the money. Moreover, Mr Blyler had an affirmative obligation to inform his client and the court as to the levy and seizure of funds. We find that Mr. Blyler's failure to inform those whose property he was charged with safekeeping of the seizure of funds was an intentional act.

With respect to the level of injury, this Court finds that the injury suffered by the client and others was serious. Not only is the amount at issue considerable, but the heirs were required to retain additional counsel in a failed effort to recover the funds from the Bank and the Tax Department as well as to undertake professional negligence litigation directed at Mr. Blyler. Recognizing that Mr. Blyler has not been involved in the estate matter since September, 2012, we note that the estate remains unsettled some nine years after the second sale of property. The likelihood of success in the professional negligence action against Mr. Blyler is unknown. Additionally, his client and other heirs suffered emotional distress, and the tenor of Mr. Cogar's testimony regarding the impact on his family members teaches that faith in the judicial and legal system has been eroded.

We next consider the presence of any aggravating factors. "Aggravating

40

factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. pt. 4, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003). As identified in the American Bar Association Standards for Imposing Lawyer Sanctions, aggravating factors may include prior disciplinary offenses, dishonest or selfish motive, a pattern of misconduct, multiple offenses, bad faith obstruction of the disciplinary process, submission of false evidence or deceptive practices during the disciplinary process, refusal to acknowledge wrongdoing, vulnerability of the victim, substantial experience in the practice of law, indifference to making restitution, and illegal conduct. This Court finds that there was dishonesty on the part of Mr. Blyler in failing to inform his client and the court about the tax levy and in failing to immediately and diligently undertake all appropriate and necessary action to recover the seized money. Additionally, we find that Mr. Blyler's substantial experience practicing law and serving as a special commissioner with respect to judicial sales constitutes an aggravating factor because Mr. Blyler knew what was expected of him in terms of professional and ethical conduct.

This Court must also consider whether there are any factors that justify a reduction, or mitigation, in the degree of discipline. As we held in *Scott*,

> "[m]itigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of

41

dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or rectify consequences of misconduct; (5) full and free disclosure to the disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10 ) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

*Id.,* Syl. pt. 3, 213 W. Va. 209, 579 S.E.2d 550.

The HPS found the absence of a disciplinary record to be a mitigating factor. However, it noted that there had been prior discipline for Mr. Blyler's failure to respond to communications from the ODC. The ODC mistakenly conceded in post-hearing briefing that there was no prior discipline. They now seek to have prior discipline considered as an aggravating and not a mitigating factor. The record reflects that Mr. Blyler was admonished in 1994 for conduct surrounding a divorce and a sale of property. Mr. Blyler was admonished in 2001 for failing to respond to communication from the ODC. Finally, in 2006, upon an agreed stipulation and recommendation presented in 2004 for conduct that occurred in 2001 and 2002, this Court publically reprimanded Mr. Blyler for his failures to respond to communications from the ODC. The record is plain that Mr. Blyler has been the subject of prior disciplinary action. The nature of the conduct at issue in the prior disciplinary matters is dissimilar to the conduct at issue here. Moreover, the prior discipline involved remote conduct. Therefore, we decline to consider such record as either

42

aggravating or mitigating.

As to other mitigating factors, this Court concludes that the testimony overwhelmingly established the significant personal, emotional, and financial toll placed on Mr. Blyler while caring for his wife as she suffered through early onset Alzheimer's disease, which required Mr. Blyler's continual care and assistance in every activity of life as she progressively declined both physically and cognitively. It is plain that Mr. Blyler was devoted to the needs of his dying wife while continuing to serve a community with his small, general, rural law practice.

We also find that the record establishes that the conduct at issue was aberrant in that attorneys who have practiced in Webster County testified as to the good character and reputation of Mr. Blyler. Attorney Morton testified that, in her professional encounters with Mr. Blyler, he always appeared to be competent and diligent, that he provided a service to a community in need, and that he had contributed to the good of the community for some forty years. She did not think that the conduct would have occurred but for the challenges of meeting the needs of his wife. Likewise, the prosecutor, Mr. Vandevender, testified as to Mr. Blyler's competent, timely, and good advocacy for his clients. Mr. Vandevender stated his belief that, if Mr. Blyler were allowed to continue practicing law with supervision, Mr. Blyler would comply with all that was required of him. A former client of Mr. Blyler's also

43

testified remarking on how "pathetic" the situation with his wife had been and that his representation had always been competent, timely, and professional such that she trusted him. Accordingly, we find that the evidence of good character and reputation serves as a mitigating factor.

This Court further finds that Mr. Blyler's cooperation, free disclosure, and attitude toward the disciplinary process constitutes a mitigating factor. Mr. Blyler entered into extensive factual stipulations and admitted violations. Additionally, the record reflects his acknowledgment of wrongdoing, tremendous remorse, and contrition. As he stated during the proceeding: "[I]t's not [Mr. Mauser's] fault. It's not [my wife's] fault. It's not God's fault. It's my fault." Mr. Blyler wept throughout his testimony. Recesses were taken in order that Mr. Blyler could collect himself.

Finally, as to mitigation, we find that there was an absence of selfish motive in that there was no conduct aimed at obtaining any benefit for himself. Mr. Blyler testified that the matter of the seized funds was not a priority to him given the illness of his wife. He acknowledges, however, that addressing the seized funds should have been a priority. Mr. Blyler also testified that he was embarrassed about the fact that the money was seized due to his tax liability. He also indicated that he simply could not imagine, in his "wildest dreams," that the Tax Department would not return the money. At the same time that he was

44

not forthcoming with information about the seizure to his client or to the circuit court, Mr. Blyler was seeking to have a report completed for a hearing and disbursal allocation, which would have revealed the absence of the funds. Mr. Blyler's acts and failures to act subsequent to the seizure of the funds simply cannot be rationalized. Perhaps the best explanation for the post-seizure conduct of Mr. Blyler comes from Attorney Morton who stated her belief that dealing with the problem of the seized funds took a backseat to Mr. Blyler's personal issues due to human frailties.

The HPS recommended a strong public reprimand together with eighteen months of supervised practice and other sanctions. The ODC urges that the recommended sanction is inadequate. Mr. Blyler seeks adoption of the recommended sanction and requests that, in addition to the mitigating factors, we consider the legal needs of the community and that continuing to practice will afford Mr. Blyler a means of making financial restitution.

The unique facts that started the proverbial snowball rolling down the hill, together with the extraordinary personal issues constituting a mitigating factor in determining the appropriate sanction, present a challenge to crafting a meaningful sanction that meets the goals of disciplinary action.

We recognize that sanctions that are inadequate fail to deter misconduct.

45

Sanctions that are too onerous may result in eroding confidence in the disciplinary system and deter lawyers from reporting violations. Inconsistent sanctions undermine confidence in and fairness of the disciplinary system. Our task is to thoroughly consider the misconduct at issue and rationally evaluate all the relevant factors so as to impose the appropriate sanction in each individual lawyer's case.

In determining a sanction for Mr. Blyler that effectively punishes him, deters other lawyers from engaging in similar conduct and restores public confidence, we are compelled to consider what his acts and failures to act did not include. This matter does not involve misappropriation of money from innocent parties for the lawyer's personal use. *See Lawyer Disciplinary Bd. v. Sayre,* 207 W. Va. 654, 535 S.E.2d 719 (2000) (disbarment). Mr. Blyler did not embezzle from an elderly client while acting as her appointed commissioner. *See Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998) (license annulled). The conduct of Mr. Blyler did not involve virtually daily unauthorized accessing of the email communications of other lawyers over a two year period. *See Lawyer Disciplinary Bd. v. Markins*, 222 W. Va. 160, 663 S.E.2d 614 (2008) (two year suspension). This case does not include conduct, such as altering checks, misrepresenting payment of expenses, or actively scheming and diverting funds held in trust for personal use. *See Lawyer Disciplinary Bd. v. McCorkle*, 219 W. Va. 245, 633 S.E.2d 1 (2006) (annulment). Mr. Blyler did not convert personal injury settlement proceeds and submit fraudulent

46

accountings of funds converted to his own use in multiple instances. *See Lawyer Disciplinary Bd. v. Barton*, 225 W. Va. 111, 690 S.E.2d 119 (2010) (annulment). We are not confronted with a situation where a lawyer intentionally converted client funds to his own use and lied about it to the client and law enforcement. Nor did Mr. Blyler commit multiple acts of failing to file civil complaints resulting in the tolling of the statute of limitations and thereafter lie to his clients about the status of their claims. *See Lawyer Disciplinary Bd. v. Wheaton*, 216 W. Va. 673, 610 S.E.2d 8 (2004) (annulment). Mr. Blyler did not mishandle multiple estates subsequent to disciplinary action for similar unethical conduct. *See Lawyer Disciplinary Bd. v. Albright*, 227 W. Va. 197, 706 S.E.2d 552 (one year suspension). The issue before us does not include falsifying checks, lying under oath, lying about filing personal injury claims, lying about the dismissals of civil actions or lying about actions taken in criminal matters. Mr. Blyler's violations were not a result of misconduct while serving as an elected public official. *See Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003). Nevertheless, the unethical behavior in failing to disclose the seizure of the funds is extremely serious and dictates the imposition of meaningful sanctions.

In advocating for a one year suspension of Mr. Blyler's license, the ODC relies upon *In re Skagon*, 149 P.3d 1171, 342 Or. 183 (2006). *Skagon* involved the negligent handling of client funds and a trust account. The lawyer engaged in deceptive conduct regarding his misbehavior. In *Skagon*, the lawyer refused to cooperate with the disciplinary

47

process.  The deceptive conduct and the failure to cooperate with the disciplinary process resulted in the increase of sanction from that of reprimand to a one year suspension.  While the *Skagon* case is similar in that it involved both negligence and intentional conduct, we find that it is distinguishable because, unlike the lawyer in *Skagon*, Mr. Blyler has fully cooperated with the ODC and worked to enter into extensive findings and admitted violations.  Moreover, in *Skagon* there were no mitigating factors present.

The ODC also relies on *Lawyer Disciplinary Bd. v. Santa Barbara*, 229 W. Va. 344, 729 S.E.2d 179 (2012), as further support for a one year sanction.  We find the analysis in *Santa Barbara* helpful, but not dispositive.  *Santa Barbara* involved multiple complaints and violations involving five different clients over a substantial period of time.  The conduct in *Santa Barbara* resulted in the expiration of the statute of limitation with respect to four separate claims.  The transgressions in *Santa Barbara* included failures to manage funds withheld from a settlement over an extended period of time and culminating in an insufficiency of funds with no explanation as to that insufficiency.  There were also repeated failures to communicate with clients.  The sanction included a one year suspension considering mitigating factors of depression and problems with a secretary who, ultimately, was fired.  The multiple, repeated, offenses over a lengthy time-frame distinguish *Santa Barbara* from the situation at issue with Mr. Blyler.

48

We observe it was represented that Mr. Blyler has recently made a restitution payment of nine thousand dollars ($9,000.00) into the circuit court account where the funds from the surety bond were deposited and remain pending disbursement.[9] We further recognize that the sanctionable conduct at issue concluded in September 2012. The complaint was filed by Mr. Cogar in November 2012. However, the statement of charges was not filed until April, 2014. Although Mr. Blyler reduced the type of cases he accepted, and took a short break from practice following the death of his wife, Mr. Blyler has continued to practice law during the extended pendency of these proceedings. We are aware of no other complaints regarding Mr. Blyler's conduct during that time.

In balancing all the factors and considerations with the goals of lawyer discipline, together with the unique factual circumstances herein presented, we conclude that the sanction of strong reprimand is too lenient, but the request by the ODC for a one-year suspension is too harsh. Accordingly, we find that, Mr. Blyler's license to practice law should be suspended for sixty days.[10] We further find that the other sanctions recommended

---

[9]The record reflects that there is currently fifty-nine thousand dollars ($59,000.00) in a circuit court account that has not been disbursed to Mr. Cogar and others who may be entitled to a portion of the funds. We are concerned that this matter arises out of a death in 2003 and judicial sales of property in 2006 and 2007. No explanation has been offered for the continued delay which detrimentally affects Mr. Cogar and others.

[10]As Mr. Blyler's suspension will be for a period of sixty days, he is subject to being automatically reinstated pursuant to the provisions of Rule 3.31 of the West Virginia Rules of Disciplinary Procedure.

by the HPS shall be supplemented with the requirement that Mr Blyler complete additional continuing legal education in the area of ethics.

We also must address the request by the ODC that Mr. Blyler immediately make restitution. *Lawyer Disciplinary Bd. v. Rossi*, 234 W. Va. 675, 769 S.E.2d 464 (2015), is cited by the ODC as support for the request that Mr. Blyler be ordered to refund immediately the seized funds. The ODC asserts that Mr. Blyler will always have the benefit of his unethical conduct due to the reduction of his tax lien by virtue of the seizure of the funds from the "Special Account." In *Rossi*, it was uncertain whether a default judgment order would be enforced. This Court ordered that, in the event the former client is required to pay the default judgment, the lawyer was required to make full restitution, but no time-line was set forth. The Court further noted that an order of restitution may be enforced in two ways. First, enforcement may be handled by the ODC seeking a contempt order. Second, enforcement may be accomplished by the prosecution of a separate lawsuit.

A separate lawsuit alleging malpractice has been brought by those who have been detrimentally affected by the failings of Mr. Blyler. Mr. Blyler carried professional negligence insurance. We are informed that there is a dispute regarding the applicability of coverage. The record reflects that a reservation of rights letter has been sent by Mr. Blyler's insurance carrier. The position of the carrier is said to be that the Tax Department was in

error in seizing and failing to return the funds, and that Mr. Blyler was not acting as a lawyer when serving as the Special Commissioner. We have no information as to the current status of the coverage dispute.

Currently, there is an indeterminate amount owed by Mr. Blyler in restitution. Mr. Blyler and the ODC shall cooperate and complete an accounting, which takes into consideration the payment into the circuit court of the surety bond, whether the bonding company will seek to recover the payment from Mr. Blyler, the status and progress of the malpractice action, the availability of insurance coverage, and the costs incurred by Mr. Cogar and the other heirs of his father in pursuing actions to recover the seized funds. In addition, a time-frame for restitution shall be established and shall not exceed twenty-four months from the date of filing of this Opinion. We have chosen twenty-four months, rather than the thirty-six month time-frame recommended by the HPS, due to the fact that it has been an extended period of seven years since the funds were seized.

Finally, we would be remiss if we failed to note Mr. Blyler's expression of self-diagnosed "depression" in the hearing transcript. We also note that Mr. Blyler stated that he was not consulting with anybody for his depression as it was being "worked out." Certainly, individuals dealing with the strain of a serious illness and subsequent death of a loved one over an extended period of time would have an emotional response. Mr. Blyler made no

effort whatsoever to attribute his violations to his self-diagnosed depression. Nor did he make any effort to have depression considered as a mitigating factor for the purpose of assessing sanctions. Nevertheless, as part of our obligation to the public and to the profession, Mr. Blyler's testimony regarding depression informs an element of our sanction. As set forth below, this Court will require an evaluation of Mr. Blyler's need for counseling as a condition of continued practice.

## IV.

## CONCLUSION

For the reasons explained above, we adopt, as moulded, the following sanctions by the Hearing Panel Subcommittee: (1) that Mr. Blyler's law license be suspended for a period of sixty days; (2) that upon completion of the sixty day suspension, Mr. Blyler be placed on a probationary period of supervised practice for eighteen months, with supervision provided by a lawyer approved by the ODC; (3) that Mr. Blyler cooperate with the ODC in order to complete an accounting for purposes of defining the amount of restitution, and that takes into consideration factors set out in this Opinion; (4) that Mr. Blyler make restitution within twenty-four months from the date of this Opinion; (5) that Mr. Blyler complete an additional twelve hours of continuing legal education in the area of ethics within twelve months from the date of this Opinion; (6) that Mr. Blyler be evaluated by a licensed professional counselor, psychologist, or psychiatrist of his choosing to assess his need for

counseling, the evaluator being required to provide to the ODC a report, which shall be confidential and not disclosed to third parties, as to whether Mr. Blyler would benefit from counseling, and, in the event that the confidential report recommends counseling, Mr. Blyler shall be required to comply with such recommendation as a condition of his period of supervised practice; and (7) that Mr. Blyler pay the costs and expenses incurred by the ODC in the prosecution of this proceeding, including costs and expenses incurred by the ODC in overseeing Mr. Blyler's completion of all the sanctions herein set forth.

Law License Suspended and other Sanctions.

53