IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2020 Term

_____

No. 18-0918

_____

FILED
May 8, 2020
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,
Petitioner

v.

JAMES B. ATKINS, a Member of the West Virginia State Bar,
Respondent

_____

Lawyer Disciplinary Proceeding

LAW LICENSE SUSPENDED AND OTHER SANCTIONS IMPOSED

_____

Submitted: January 14, 2020
Filed: May 8, 2020

Rachel L. Fletcher Cipoletti, Esq.
Chief Lawyer Disciplinary Counsel
Andrea J. Hinerman, Esq.
Senior Lawyer Disciplinary Counsel
Office of Lawyer Disciplinary Counsel
Charleston, West Virginia
Counsel for the Petitioner

Jared M. Tully, Esq.
Frost Brown Todd LLC
Charleston, West Virginia
Counsel for the Respondent

CHIEF JUSTICE ARMSTEAD delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the [West Virginia Supreme Court of Appeals] or [Lawyer Disciplinary Board] shall consider the following factors:  (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'"  Syllabus Point 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

2.      "A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar [currently, the Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment.  On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record."  Syllabus Point 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

i

3.      "Rule 3.7 of the Rules of Lawyer Disciplinary Procedure, effective July 1, 1994, requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence."  Syllabus Point 2, in part, *Lawyer Disciplinary Board v. Cunningham*, 195 W. Va. 27, 464 S.E.2d 181 (1995).

4.      "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law."  Syllabus point 3, *Committee on Legal Ethics of the West Virginia State Bar v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

5.      "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession."  Syllabus Point 7, in part, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

6.      "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed."  Syllabus Point 4, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

7.      "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed."  Syllabus Point 2, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

8. "Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses." Syllabus Point 3, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

Armstead, Chief Justice:

This is a lawyer disciplinary proceeding brought against James B. Atkins ("Mr. Atkins") by the Lawyer Disciplinary Board ("LDB"). A Hearing Panel Subcommittee ("HPS") of the LDB determined that Mr. Atkins committed multiple violations of the West Virginia Rules of Professional Conduct. It recommended a number of sanctions be imposed against Mr. Atkins, including a three month suspension of his law license. The Office of Disciplinary Counsel and Mr. Atkins filed consents to the recommendations of the HPS.[1]

Upon review, this Court finds that clear and convincing evidence exists to support the HPS's determination that Mr. Atkins committed multiple violations of the West Virginia Rules of Professional Conduct. We disagree, however, with the HPS's recommendation that a three month suspension with automatic reinstatement is sufficient discipline. We find, instead, that Mr. Atkins's misconduct warrants a nine month suspension from the practice of law, which will require him to petition for the reinstatement of his law license pursuant to Rule 3.32 of the Rules of Lawyer Disciplinary Procedure, followed by one year of probation. With the exception of the HPS's first recommendation (Recommendation A), the HPS's remaining recommended sanctions are adopted in full.

---

[1] In his brief filed on December 9, 2019, Mr. Atkins acknowledged his previously filed consent, but argued that the LDB's present arguments did not fully account for the evidence which this Court should weigh in its imposition of sanctions. Mr. Atkins requested that this Court impose the sanction of reprimand.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

The events giving rise to the instant proceeding occurred in 2016 and 2017. During that time, Mr. Atkins was a lawyer practicing in Buffalo, which is located in Putnam County, West Virginia. He was admitted to the West Virginia State Bar in 2002. As such, Mr. Atkins is subject to the disciplinary jurisdiction of this Court.

On or about January 9, 2017, Kirk E. Brumbaugh, Esquire, ("Mr. Brumbaugh")[2] filed a complaint alleging that Mr. Atkins had reached a settlement in a debt collection case ("Bishop Matter") but had failed to remit the settlement funds to Mr. Brumbaugh's law firm.[3] Mr. Brumbaugh alleged that an email inquiring about the status of the settlement funds was sent to Mr. Atkins on or about January 4, 2016. In response to this inquiry, Mr. Brumbaugh was advised that the funds would be received from the debtor in or about February of 2016. Following that exchange, Mr. Brumbaugh alleged that Mr. Atkins or employees of his law firm failed to respond to seven emails sent between March of 2016 and September of 2016 and nine voicemails left between September of 2016 and November of 2016, inquiring about the status of the settlement funds.

---

[2] Mr. Brumbaugh is an attorney licensed to practice law in Nebraska and Iowa.

[3] The Bishop Matter was referred to Mr. Atkins's law office by Mr. Brumbaugh's office. During his sworn statement on September 12, 2017, Mr. Atkins described the relationship between his firm and the Brumbaugh & Quandahl firm as follows: Brumbaugh & Quandahl was a "clearing house in the debt collection industry" whose "job is [sic] take the large portfolio of cases that [a national bank] might have and to go and find attorneys that are in the network" and "farm out the cases that happen to be in those states or those regions." Although Mr. Atkins's client would be the named plaintiff (i.e., the bank), Mr. Atkins "answered" to Brumbaugh & Quandahl, and the client would deal with Brumbaugh & Quandahl.

In December of 2016, Mr. Brumbaugh sent his associate to Mr. Atkins's office to perform an audit of the files that Mr. Atkins was handling for his firm. Mr. Brumbaugh testified that his associate was instructed to "either pick up a check or report the matter to local law enforcement."[4] On January 9, 2017, Mr. Brumbaugh filed a formal complaint against Mr. Atkins. Mr. Atkins responded to the complaint on January 25, 2017. On that same date, Mr. Atkins remitted the settlement funds to Mr. Brumbaugh.

On September 12, 2017, Mr. Atkins appeared at the Office of Lawyer Disciplinary Counsel for a sworn statement in this matter. He stated that the Bishop Matter had been dormant for a number of years before his office received calls requesting the payoff amount or settlement amount. Mr. Atkins also stated that his office received the settlement funds on or about January 16, 2016, that the funds had been deposited into his client trust account, that he had held the money in that account for a year, and that the funds had not been remitted to Mr. Brumbaugh until after the filing of the ethics complaint in January of 2017.

The LDB issued a formal Statement of Charges against Mr. Atkins on October 23, 2018. The Statement of Charges contained one count alleging violations of Rules 1.3, 1.4(a)(3), 1.4(a)(4), 1.15(a), 1.15(d), 8.4(c), 8.4(d), 5.3, and 8.1(a) of the West Virginia Rules of Professional Conduct.

On February 21, 2019, a hearing was held before the HPS. At that time, the HPS heard testimony from Mr. Brumbaugh and Mr. Atkins. Mr. Brumbaugh testified in support

---

[4] Mr. Brumbaugh also described the purpose of his associate's visit to Mr. Atkins's office was to "shake the money tree." The visit was also described as a "termination audit."

of his complaint, and stated that Mr. Atkins settled the Bishop Matter and failed to remit the settlement funds to his (Mr. Brumbaugh's) office for almost one year despite numerous inquiries about the status of the settlement funds. He further testified that contact was made with Mr. Atkins in November of 2016.[5] Although there is conflicting testimony regarding the November communication, Mr. Atkins admitted that he first became aware of the issues with the Bishop Matter at that time.[6] Due to the fact that he had still not received the funds near the end of December of 2016, Mr. Brumbaugh sent his associate to West Virginia to "either pick up a check or report the matter to local law enforcement."[7] Mr. Atkins confirmed that Mr. Brumbaugh's associate traveled to West Virginia in December of 2016 for an "onsite closing audit." However, Mr. Atkins testified that Mr. Brumbaugh's associate instructed him to send the remittance within 30 to 45 days after receiving instructions regarding money that was owed to Mr. Atkins's firm. Mr. Atkins also confirmed that the settlement funds were remitted to Mr. Brumbaugh on or about January 25, 2017 after the filing of the ethics complaint.

On July 1, 2019, the HPS filed its written recommended disposition. The HPS determined that Mr. Atkins violated duties to his client, to the legal system and to the legal

---

[5] Mr. Brumbaugh testified that it was his recollection that he spoke with Mr. Atkins on the phone. Mr. Atkins testified that he spoke with Ms. Denniston from Brumbaugh & Quandahl, not Mr. Brumbaugh.

[6] Mr. Atkins testified that he was not aware that his office had not been responding to the inquiries regarding the Bishop Matter. He also stated that his client liaison who communicated with clients and answered their questions was having personal issues during the timeframe at issue.

[7] Mr. Brumbaugh's associate did not collect the settlement funds, and it does not appear that a police report was filed.

profession. Specifically, the HPS found that Mr. Atkins: (1) failed to act with reasonable diligence in violation of Rule 1.3 of the West Virginia Rules of Professional Conduct; (2) failed to keep Mr. Brumbaugh reasonably informed about the status of the matter and failed to promptly comply with reasonable requests for information in violation of Rule 1.4(a)(3) and Rule 1.4(a)(4) of the West Virginia Rules of Professional Conduct; failed to hold client funds in an account designated as a "client's trust account" in violation of Rule 1.15(a) of the West Virginia Rules of Professional Conduct; (3) failed to promptly notify Mr. Brumbaugh he had received funds in which Mr. Brumbaugh had an interest and then failed to promptly deliver the funds to Mr. Brumbaugh in violation of Rule 1.15(d) of the West Virginia Rules of Professional Conduct; (4) wrongfully misappropriated and converted funds belonging to his client or a third party to his own use in violation of Rule 8.4(c) and Rule 8.4(d) of the West Virginia Rules of Professional Conduct; (5) failed to supervise his nonlawyer assistants to ensure that their conduct was compatible with his professional obligations in violation of Rule 5.3 of the West Virginia Rules of Professional Conduct; and (6) made a false statement of material fact in connection with a disciplinary matter at his September 12, 2017 sworn statement when he answered "Yes, ma'am" to the question, "[a]nd so that money had been held in your [client] account for a year[,]" when the balance of that bank account fell below the amount that he was required to safeguard in violation of Rule 8.1(a) of the West Virginia Rules of Professional Conduct.

5

The HPS also found that Mr. Atkins acted negligently and knowingly and that the amount of real injury was great.[8] Further, the HPS found that two aggravating factors were present: (1) substantial experience in the practice of law; and (2) multiple offenses. With respect to mitigating factors, the HPS found that two mitigating factors were present: (1) absence of a disciplinary record; and (2) remorse.[9] Based on these findings, the HPS recommended: (1) that Mr. Atkins's law license be suspended for three months with automatic reinstatement pursuant to the provisions and requirements of Rule 3.31 of the Rules of Lawyer Disciplinary Procedure; (2) that, prior to reinstatement, Mr. Atkins complete an additional nine hours of continuing legal education during the current reporting period of which at least three hours should be in IOLTA accounts and the other six hours should be in the area of ethics and office management; (3) that Mr. Atkins must comply with the mandates of Rule 3.28 of the Rules of Lawyer Disciplinary Procedure; and (4) that Mr. Atkins be ordered to pay the costs of these proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure and that the same shall be paid prior to reinstatement.

---

[8] Mr. Brumbaugh's client had no choice but to release the lien on the debtor's mortgage because the bank had been notified that the funds had been deposited in Mr. Atkins's account, even though the funds had not been remitted to the client. Further, Mr. Brumbaugh also testified that the non-remittance of the funds caused regulatory and audit issues with the bank.

[9] The HPS agreed with ODC's assertion that payment of the funds to the client in January of 2017 should not be considered a mitigating factor in Mr. Atkins's favor. The HPS referenced *ABA Model Standards for Imposing Lawyer Sanctions*, 9.4(a) (1992), which provides that "forced or compelled restitution" is a factor which is neither aggravating nor mitigating.

The HPS filed its recommendation with this Court on July 1, 2019. On July 30, 2019, ODC, by counsel, filed its consent to the recommendation. On July 31, 2019, Mr. Atkins, by counsel, filed his consent to the recommendation. By order entered on September 5, 2019, this Court ruled that it did not concur with the recommended disposition and set the matter for argument.

## II. STANDARD OF REVIEW

In *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 289, 452 S.E.2d 377, 380 (1994), this Court took the opportunity to "resolve any doubt as to the applicable standard of judicial review" in lawyer disciplinary cases. In Syllabus Point 3 of *McCorkle*, this Court held:

> A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar [currently, the Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

The above standard of review is consistent with this Court's ultimate authority with regard to legal ethics matters in this State: "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

7

Rule 3.7 of the West Virginia Rules of Lawyer Disciplinary Procedure provides that, in order to recommend the imposition of discipline of a lawyer, "the allegations of the formal charge must be proved by clear and convincing evidence." *See also* Syl. Pt. 2, in part, *Lawyer Disciplinary Board v. Cunningham*, 195 W. Va. 27, 464 S.E.2d 181 (1995). The various sanctions which may be recommended to this Court are set forth in Rule 3.15. It states:

> A Hearing Panel Subcommittee may recommend or the Supreme Court of Appeals may impose any one or more of the following sanctions for a violation of the *Rules of Professional Conduct* … (1) probation; (2) restitution; (3) limitation on the nature or extent of future practice; (4) supervised practice; (5) community service; (6) admonishment; (7) reprimand; (8) suspension; or (9) annulment. When a sanction is imposed the Hearing Panel Subcommittee may recommend and the Court may order the lawyer to reimburse the Lawyer Disciplinary Board for the costs of the proceeding. Willful failure to reimburse the Board may be punished as contempt of the Court.

In devising suitable sanctions for attorney misconduct, we have recognized that "[a]ttorney disciplinary proceedings are not designed solely to punish the attorney, but rather to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice." *Lawyer Disciplinary Board v. Taylor*, 192 W. Va. 139, 144, 451 S.E.2d 440, 445 (1994).

### III. ANALYSIS

The HPS recommended, among other sanctions, a suspension of Mr. Atkins's license to practice law for three months. Subsequent to the filing of the HPS's recommendation, the ODC and Mr. Atkins filed consents to the sanctions recommended by the HPS. In his brief filed on December 9, 2019, Mr. Atkins acknowledged his

8

previously filed consent and admitted that he agreed to the three month suspension recommended by the HPS in the interest of accepting responsibility, finality, and closure. However, he went on to argue that this Court's precedent indicates that a reprimand is appropriate and requested this Court to impose the sanction of reprimand.

Mr. Atkins admitted to violating Rules 1.3, 1.4, 1.15(d), and 5.3 of the West Virginia Rules of Professional Conduct. The HPS also found that Mr. Atkins violated Rules 1.15(a), 8.1(a), 8.4(c) and 8.4(d), and we agree. At this point, "[t]he burden is on the attorney at law to show that the factual findings are not supported by reliable, probative, and substantial evidence on the whole adjudicatory record made before the Board." *Lawyer Disciplinary Board v. Cunningham*, 195 W.Va. 27, 35, 464 S.E.2d 181, 189 (1995). We agree with the HPS that the whole adjudicatory record reveals that Mr. Atkins violated the rules with which he takes issue.

With respect to sanctions, this Court held in Syllabus Point 7 of *Office of Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998) (internal citations omitted):

> In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

In considering the appropriate sanctions to impose in this case, we are guided by the well-settled principle that:

> Rule 3.16 of the *West Virginia Rules of Lawyer Disciplinary Procedure* enumerates factors to be considered in imposing sanctions and provides as

9

follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the [West Virginia Supreme Court of Appeals] or [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.

Syl. Pt. 4, *Jordan*. We will now consider the four factors contained in Rule 3.16.

## 1. Duties Owed to Clients, the Public, the Legal System, or the Profession

It is clear that Mr. Atkins violated duties to his client, to the legal system and to the legal profession. The HPS found that the evidence in this case "clearly and convincingly" demonstrated that Mr. Atkins committed multiple violations of the West Virginia Rules of Professional Conduct. Specifically, the HPS found that Mr. Atkins (1) failed to act with reasonable diligence and promptness in representing his client; (2) failed to communicate effectively with his client; (3) failed to promptly notify his client that client funds had been received and failed to promptly remit those funds to the client which resulted in his failure to safeguard his client's property such that client money was comingled with other law firm money and misappropriated; (4) failed to supervise his nonlawyer staff and to make reasonable efforts to ensure that the firm had in effect measures giving reasonable assurance that the nonlawyer's conduct was compatible with his own professional obligations; (5) knowingly made a false statement of material fact in connection with a disciplinary matter; and (6) engaged in conduct that constitutes misrepresentation and was prejudicial to the administration of justice.

10

The Bishop Matter was referred by Mr. Brumbaugh's firm to Mr. Atkins's firm in 2007. There was difficulty in locating the debtor from 2007-2013. However, the debtor was eventually located, and a judgment was entered against the debtor for $14,807.55 in approximately 2013. This matter stalled again until 2015 when the debtor attempted to refinance her home and wanted to settle the judgment. Mr. Brumbaugh testified that on October 15, 2015, the bank called his office and informed them that there had been contact from a title company who offered to settle the judgment that had been obtained by Mr. Atkins's law firm in 2013. The bank instructed Mr. Brumbaugh's office to accept the settlement of the debt, and this instruction was communicated to Mr. Atkins's law firm by email dated November 13, 2015. Four days later, on November 17, 2015, this instruction was confirmed, and an employee of Mr. Atkins indicated that the letter regarding the acceptance of the $14,807.55 would be faxed on that same date. Approximately one and a half months later, on January 5, 2016, Mr. Brumbaugh's office reached out to Mr. Atkins's office to inquire as to the status of the settlement funds. On the following day, Mr. Atkins's office responded by noting that it would be close to February before they would receive the funds.

The bank records from Mr. Atkins's firm show that a check for $14,807.55 was deposited in Mr. Atkins's "Client Account" on January 20, 2016. Neither Mr. Atkins nor anyone at his office informed Mr. Brumbaugh about the receipt of the settlement funds from January through October of 2016 despite sixteen requests from Mr. Brumbaugh's office for information via emails and voicemails. It is undisputed that Mr. Atkins did not

personally get involved until November of 2016. In December of 2016, Mr. Brumbaugh sent one of his associates to Mr. Atkins's office to complete an audit and close out the file at issue in this case.[10] Although there is some disagreement about what transpired during that meeting, it is clear that the settlement funds were not paid to Mr. Brumbaugh's associate at that time. In fact, the settlement funds were not remitted to Mr. Brumbaugh for at least another month. Specifically, the funds were remitted by Mr. Atkins when he filed his response to the complaint on or about January 25, 2017, which was over one year after the funds had been deposited into Mr. Atkins's "Client Account."

## 2. Whether the lawyer acted intentionally, knowingly, or negligently

The HPS found, and we agree, that Mr. Atkins acted negligently and knowingly. The record shows that Mr. Atkins's negligent supervision of his nonlawyer staff resulted in the funds at issue being co-mingled and misappropriated for use in paying for his law office operating expenses. The settlement funds in the amount of $14,807.55 were deposited in Mr. Atkins's "Client Account" on January 20, 2016. Thereafter, Mr. Atkins's nonlawyer staff transferred money from that particular "Client Account" to the law firm's operating account for use by the law firm. The evidence showed that approximately $10,000 in debits occurred on the account on the day following the $14,807.55 deposit. In

---

[10] There is some disagreement about the December meeting. Mr. Brumbaugh alleges that he sent his associate to perform a termination audit and close out the file at issue. Mr. Brumbaugh also testified that his associate had instructions to "either collect the funds or go to make a police report." However, the funds were not collected, and a police report was not filed. Mr. Atkins testified that Mr. Brumbaugh's associate instructed him to send the remittance within 30 to 45 days after receiving instructions regarding money that was owed to Mr. Atkins's firm.

fact, this particular account held less than the $14,807.55 at multiple times during the time period at issue in this matter. Further, due to improper coding of the deposit, Mr. Atkins's accounting system was unable to track the settlement funds. This negligent conduct resulted in Mr. Atkins's client not being promptly advised of the receipt of the settlement funds and the misappropriation of the funds. By failing to safeguard his client's property such that client money was comingled with other law firm money and misappropriated to cover other law firm expenses, Mr. Atkins violated Rule 8.4(c) and Rule 8.4(d).

In November of 2016 Mr. Atkins became personally aware that the settlement funds had not been properly remitted. Despite this knowledge, he did not remit the funds until almost two months later in late January of 2017 after the filing of the complaint against him. The remittance of these funds was made a year later than it should have been made. As this Court stated in *Lawyer Disciplinary Board v. Sirk*, 240 W. Va. 274, 810 S.E.2d 276 (2018), the severity of this type of misconduct cannot be overstated:

> Like many rules governing the behavior of lawyers, this one has its roots in the confidence and trust which clients place in their attorneys. Having sought his advice and relying on his expertise, the client entrusts the lawyer with the transaction— including the handling of the client's funds. Whether it be a real estate closing, the establishment of a trust, the purchase of a business, the investment of funds, the receipt of proceeds of litigation, or any one of a multitude of other situations, it is commonplace that the work of lawyers involves possession of their clients' funds. That possession is sometimes expedient, occasionally simply customary, but usually essential. Whatever the need may be for the lawyer's handling of clients' money, the client permits it because he trusts the lawyer.
>
> It is a trust built on centuries of honesty and faithfulness. Sometimes it is reinforced by personal knowledge of a

13

> particular lawyer's integrity or a firm's reputation. The underlying faith, however, is in the legal profession, the bar as an institution. No other explanation can account for clients' customary willingness to entrust their funds to relative strangers simply because they are lawyers.
>
> Abuse of this trust has always been recognized as particularly reprehensible: "(T)here are few more egregious acts of professional misconduct of which an attorney can be guilty than misappropriation of a client's funds held in trust."

*Id*, 240 W. Va. at 282-83, 810 S.E.2d at 284-85 (quoting *In re Wilson*, 409 A.2d 1153, 1154-55 (N.J. 1979).

### 3. The Amount of Real or Potential Injury

The HPS found, and we agree, that the amount of real injury was great. Despite numerous inquiries, Mr. Brumbaugh and his staff had no knowledge of the settlement funds for almost a year. The bank had been notified that the funds had been deposited in Mr. Atkins's account so it had to release the loan on the debtor's mortgage even though Mr. Atkins's firm had not informed anyone of the receipt of the funds or remitted the funds to Mr. Brumbaugh. Further, Mr. Brumbaugh testified that "[his client] has requirements under IRS regulation and an oversight by the Office of the Comptroller of the Currency to make sure that if a balance is written off, the 1099's are timely issued. And so the non-remittance of the funds in addition to making [his] own office look bad was causing regulatory and audit issues with the bank." Finally, Mr. Brumbaugh had to use his own funds to send his associate to Mr. Atkins's office in West Virginia to follow up on this issue. We are not persuaded by Mr. Atkins's argument that there has been no actual

14

evidence of harm to the bank in this case. Mr. Atkins settled a matter on behalf of the bank and kept the settlement funds for over one year.

### 4. Aggravating or Mitigating Factors

We now turn our attention to whether any aggravating or mitigating factors are present in this case. "Aggravating factors in a lawyer disciplinary proceeding 'are any considerations or factors that may justify an increase in the degree of discipline to be imposed.'" Syl. Pt. 4, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003). The HPS found two aggravating factors were present in this matter: (1) substantial experience in the practice of law; and (2) multiple offenses. Mr. Atkins had been licensed to practice law for approximately fourteen years at the time of the offenses in this matter. Mr. Atkins began practicing law at his father's firm in 2002, and at that time, the firm had an established practice in debt collection. By his own admission, debt collection is the focus of his (and his firm's) work, and his firm has, on average, in excess of 12,000 open files and collects nearly $3 million dollars each year for its clients. The settlement funds from the Bishop Matter were received in January of 2016. During the following months, Mr. Atkins failed to keep Mr. Brumbaugh reasonably informed about the matter and failed to promptly comply with sixteen separate requests for information about the settlement funds. Mr. Atkins also: (1) failed to hold the funds in an account designated as a "client's trust account;" (2) failed to promptly notify the Mr. Brumbaugh he had received funds in which Mr. Brumbaugh had an interest and then failed to promptly deliver the funds to Mr. Brumbaugh; (3) wrongfully misappropriated and converted the funds to his own use; (4)

15

failed to properly supervise his nonlawyer assistants to ensure that their conduct was compatible with his professional obligations; and (5) knowingly made a false statement during his sworn statement on September 12, 2017.

"Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syl. Pt. 2, *Scott*.

> Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

Syl. Pt. 3, *Scott*.

The HPS found two mitigating factors were present in this matter: (1) absence of a disciplinary record; and (2) remorse. Mr. Atkins has no prior discipline, and he expressed remorse at the hearing. Although Mr. Atkins argues that additional mitigating factors are present and those other factors "militate in favor of a less severe punishment," we do not agree. Mr. Atkins did not produce any witnesses to testify about his character and reputation nor did he make a timely good faith effort to make restitution. Further, it is clear that he did not safeguard the Bishop Matter settlement funds.

16

We agree with the Lawyer Disciplinary Board that the HPS's decision to issue a suspension in this case takes into account this Court's decision in *Lawyer Disciplinary Board v. Kupec (Kupec II)*, 204 W. Va. 643, 515 S.E.2d 600 (1999), which noted that "the penalty for a misappropriation offense must be consistent with the level of intent by the lawyer and the level of the injury." *Kupec II* at 648, 605.

This Court has previously issued suspensions in cases involving lawyers who improperly dealt with client property. *See Lawyer Disciplinary Board v. Santa* Barbara, 229 W. Va. 344, 729 S.E.2d 179 (2012); and *Lawyer Disciplinary Board v. Blyler*, 237 W. Va. 325, 787 S.E.2d 596 (2016).

Although this Court is the "final arbiter of legal ethics problems," "[t]here is no 'magic formula' for this Court to determine how to weigh the host of mitigating and aggravating circumstances to arrive at an appropriate sanction; each case presents different circumstances that must be weighed against the nature and gravity of the lawyer's misconduct." *Lawyer Disciplinary Board v. Sirk*, 240 W. Va. 274, 282, 810 S.E.2d 276, 284 (2018). After considering all of the relevant factors in this matter, we agree with the HPS that the facts of this case indicate that a reprimand is not appropriate. We further conclude that the three month suspension recommendation with automatic reinstatement submitted by the HPS is too lenient. In light of the seriousness of Mr. Atkins's conduct, we cannot conclude that a suspension that permits an automatic reinstatement is adequate particularly given the fact that he misappropriated his client's funds and failed to be truthful in the investigation of this matter. Instead, we impose a nine month suspension on Mr.

17

Atkins's law license, which will require him to petition for the reinstatement of his law license pursuant to Rule 3.32 of the Rules of Lawyer Disciplinary Procedure, followed by one year of probation. Further, we adopt the remaining recommendations made to this Court by the HPS.

## IV. CONCLUSION

Accordingly, for the reasons set forth above, this Court imposes the following sanctions: Mr. Atkins's law license is suspended for a period of nine (9) months; he must comply with the mandates of Rule 3.28 of the Rules of Lawyer Disciplinary Procedure regarding the duties of suspended or disbarred lawyers; he must also comply with the mandates of Rule 3.32 of the Rules of Lawyer Disciplinary Procedure regarding reinstatement; prior to reinstatement, Mr. Atkins shall complete an additional nine (9) hours of continuing legal education during the current reporting period of which at least three (3) hours should be in IOLTA accounts and the other six (6) hours should be in the area of ethics and office management; upon reinstatement, Mr. Atkins will be placed on one (1) year of probation; and Mr. Atkins is ordered to pay the costs of this disciplinary proceeding.

Law License Suspended and Other Sanctions Imposed.